UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Dkt. No: 1: 20-cr-10222-RGS |
| v. | ) | |
| | ) | ***LEAVE TO FILE EXHIBITS UNDER*** |
| PHILIP RAYMOND | ) | ***SEAL AND TO FILE REDACTED*** |
| | ) | ***MEMORANDUM GRANTED ON 10/7/22*** |

## DEFENDANT'S SENTENCING MEMORANDUM

By pleading guilty to all charges in the Indictments and seeking a sentence that will imprison him until he is nearly 80 years old, Philip Raymond acknowledges the severe harms of his actions, and offers no justification, rationalization, or defense. These crimes are abhorrent, and they demand just punishment. The real and legitimate human impulse to protect children from the most sordid crimes will be vindicated in this sentencing by operation of law: a nonnegotiable 15-year mandatory minimum sentence. And for a man like Mr. Raymond, who has never before been incarcerated and who will spend his aging years in prison, there can be no question that concurrent sentences of 15 years' imprisonment are anything but significant and severe.

The government's sentencing recommendation plainly contemplates Mr. Raymond spending the remainder of his days and dying in federal prison. Because "a sentence of death in prison is notably harsher than a sentence that stops even a short period before […] death in prison is not to be ordered lightly, and the probability that a convict will not live out his sentence should certainly give pause to a sentencing court." *United States v. Patrick*, 707 F.3d 815, 820 (7th Cir. 2013), quoting *United States v. Wurzinger*, 467 F.3d 649, 652 (7th Cir. 2006). The question for the Court, as it always is in the wake of *United States v. Booker*, is how much incarceration is "sufficient" to achieve the sentencing goals of 18 U.S.C. § 3553(a). The inquiry is particularly

1

appropriate and necessary in Mr. Raymond's case, where the Court must impose a statutorily mandated sentence of 15 years, which alone will keep him in prison until nearly age 77 (should he receive all the statutory good time credit available to him) and perhaps until nearly age 79 (should he not).

As explained below, the consequence of the required lengthy sentence is that Mr. Raymond's risk of recidivism will approach zero when he is released to supervision. Moreover, the Bureau of Prisons' inability to meet the challenge of caring for prisoners who, like Mr. Raymond, will become elderly in its care ensures that Mr. Raymond's service of his sentence will be especially difficult. For the reasons that follow, a sentence of 180 months imprisonment – the statutorily required 15-year minimum – followed by supervised release for the remainder of his life is "sufficient but not greater than necessary" to achieve the goals of sentencing in this case. 18 U.S.C. § 3553(a)(1).

In making this request, Mr. Raymond asks this Honorable Court to impose a sentence that both recognizes the seriousness of the offenses and is evidence-based, driven not by society's revulsion of his conduct but by the wealth of relevant research which suggests that at the end of a 180-month sentence, he will pose a significantly diminished risk of recidivism and concern for public safety. A lifetime term of supervised release to follow, with sex offender registration and sex offender-specific treatment, will further these goals. Finally, Mr. Raymond agrees with the restitution requests made in this case, and joins in the government's request for restitution.

## NATURE OF THE OFFENSES

At the outset, Mr. Raymond wishes to communicate his profound remorse, absolute shame, and regret for his actions. That the charged offenses occurred some years ago, and in the majority

of instances without the then-victims' knowledge or awareness, does little to nothing to ameliorate the general and specific harms of his conduct. He recognizes that although the degrees of victimization in his case are varied, and that the harms of his offenses are difficult to quantify, his conduct was reprehensible. And although many of his efforts were attempts,[1] the law rightfully punishes his intent and conduct and, regardless of the completion of his crimes, carries the same penalty. *See* 18 U.S.C. § 2251(e). He firmly understands the gravity and the impact that his breach of trust has had on his victims and their families, and makes no attempt to minimize or excuse his actions.

He hopes that this Court understands the brevity with which he addresses the nature and circumstances of his offenses here not as minimizing them, but as his unequivocal acceptance of responsibility for the damage he has caused his victims.

## PHILIP RAYMOND'S BACKGROUND AND PERSONAL CIRCUMSTANCES

Like many who appear before this Honorable Court for sentencing, Phil Raymond is more than the worst things he has done. Though the good works and deeds that have characterized his professional, home, and community life will certainly be judged alongside and against his offenses, he is more than the sum of these parts of his life. Those who know him best describe him as "more than generous and willing to bend over backwards to help [them] or any other friend." *See* Exhibit 1, ███████████████████████████████. His friends of more than 30 years describe him as "a person of great intellect, which he has used for the benefit of others[.]" *See* Ex. 2, ███████████████████████████████. They also provide significant and moving examples of Mr. Raymond's support and efforts in times of need – from assisting in

---

[1] *See* PSR ¶ 13, reflecting five "completed" offenses and eight "attempt[ed]" offenses.

the care of his elderly, ailing father, to supporting friends in their business and entrepreneurial pursuits. *Id.* That he has people in his life – ranging from his brothers and nephew, to long-time friends – who continue to support him is evidence of his good character, and of their belief that "Phil's life has much remaining value and that he can and will make a contribution to others given the opportunity and encouragement to do so." ████████ .

*Early Life*

The youngest of three brothers, Mr. Raymond was raised in a suburb outside Chicago by his mother and father. PSR ¶ 138. Though the family lived comfortably, supported by his father's auto parts business, Mr. Raymond's adolescence was nonetheless difficult and isolating. His close childhood friend recalls that Mr. Raymond's parents were "older than most if not all of Phil's contemporaries," and "quite distant and relatively uninvolved with Phil and his friends." *See* Ex, 3, ████████████████████ . As a result, Mr. Raymond was often left on his own. *Id.*

Described as "the classic 'nerd' who was socially inept, and said the wrong, uncool things regularly," Mr. Raymond "was mocked for being 'eccentric'" by his peers. *Id.* Studies have found that boys who are bullied are especially vulnerable to becoming socially isolated.[2] Despite this, however, Mr. Raymond "was never embittered nor angry towards those who made fun of him or mocked him" and he "was always willing to help with any project or need that arose." *Id.*

*Work and Professional History*

After graduating from high school in 1975, Mr. Raymond obtained his Bachelor's degree in Electrical Engineering from Cornell University in 1979, and his Master's (also from Cornell) in

---

[2] Whitney DeCamp and Brian Newby, "From Bullied to Deviant: The Victim-Offender Overlap Among Bullying Victims," *Youth Violence and Juvenile Justice* Vol. 13 Iss. 1, at pg. 4 (2015).

Engineering in 1980. PSR ¶ 152. What followed was a life that he built here in Massachusetts, and a lengthy career characterized by a "tremendous drive and energy." ███████. Indeed, "[w]ork and more work is what he [did] best." *Id.* Early on, he worked in the nascent industry of computers and software development, and eventually started his own businesses. *Id.*, PSR ¶¶ 161-62. He was proficient in computer encryption and network security, and lectured on the subjects.

To the extent that the government argues that his proficiency in computers and encryption should be an aggravating factor in this case, it is worth noting that his professed prowess in these areas was certainly no match for law enforcement's efforts to access his devices and their contents. The "encryption" used for the images and documents at issue in this case was beyond simple: words and names spelled backwards. And second, the scheme of production largely used in this case was rudimentary, in the form of a spy pen. Of course, this does not excuse his conduct – but it does demonstrate that his alleged professional proficiencies in these areas did not obstruct the investigation in this case.

## SENTENCING GUIDELINES

While this Court must correctly calculate the guideline range, *Gall v. United States*, 552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51; *Nelson v. United States*, 555 U.S. 350, 352 (2009), and must instead treat it as "one factor among several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors," "make an individualized assessment based on the facts presented," *id.* at 49-50; *Pepper v. United States*, 131 S. Ct. 1229, 1242- 43 (2011). The Court's "overarching" duty is to "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at

5

101; *Pepper*, 131 S. Ct. at 1242-43.

The guidelines are only "a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 351 (2007). The Court is free to reject a guideline sentence, "perhaps because the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps because the case warrants a different sentence regardless." *Id.* at 350-351. Where a particular guideline application does not consider "empirical data and national experience" and would yield "a sentence greater than necessary to achieve § 3553(a)'s purposes," a district court's decision to vary from the guidelines is not an abuse of discretion. *Kimbrough*, supra, at 110. The child pornography guidelines have been called "a one-way ratchet, repeatedly turned by Congress,"[3] with the increasingly punitive amendments driven by politics rather than empirical or evidence-based research. *United States v. Dorvee*, 616 F.3d 174, 184-85, 187-188 (2nd Cir. 2010) (describing the child pornography guideline as "an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results" and mechanical application of the guidelines was "fundamentally incompatible with § 3553(a).").

Until 1998, a production offense carried a maximum penalty of ten years with no required minimum sentence. In the next five years, Congress tripled the maximum sentence as part of its wholesale ratcheting up of child pornography penalties culminating in the PROTECT Act, which, in addition to extending the maximum sentence to thirty years, enacted the statutorily required minimum fifteen-year sentence. The Sentencing Commission followed Congress's lead and direction over the years with parallel increases in § 2G2.1's base offense level. In response to the

---

[3] *See also* Carol S. Steiker, "Lessons from Two Failures: Sentencing for Cocaine and Child Pornography under the Federal Sentencing Guidelines in the United States," 76 *Law & Contemp. Probs.* Vol, 76, No. 1, at 37 (2013).

PROTECT Act's exponential increase in the applicable mandatory minimums and maximums, for example, the Sentencing Commission was compelled to raise the base offense level for production offenses from 27 to 32 and to add additional enhancements that might potentially apply. U.S. Sentencing Commission, Amendment 664.

Though advocates and courts alike have characterized certain specific offense characteristics and enhancements applied in the majority of child pornography cases as "all but inherent in the crime of conviction," *Dorvee*, 616 F.3d at 186, the same is true for the mechanical application of the five-level enhancement under U.S.S.G. § 4B1.5(b) with respect to "repeat and dangerous sex offenders." This enhancement, which does not require a prior conviction to apply, should be viewed with substantial skepticism in the effort to determine an individualized sentence. The Sentencing Commission reports that the enhancement now applies to more than half – 51.6 % – of all defendants sentenced under U.S.S.G. § 2G2.1.[4] And as the Commission notes, application of the "repeat and dangerous" enhancement has more than doubled since 2010, an increase almost entirely from its application to defendants like Mr. Raymond, who have less extensive or no criminal records but whose offense conduct involves more than one instance of prohibited sexual conduct, instead of to defendants with prior convictions.[5] Thus, although he does not dispute its inclusion in his guidelines calculation, the increasing prevalence of the "repeat and dangerous" enhancement undercuts its efficacy in determining relative culpability.[6]

---

[4] U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Production Offenses* (October 2021) at 19, https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20211013_Production-CP.pdf.

[5] *Id.*

[6] To be clear, a defendant does not go unpunished for involving more than one victim in the production offense if U.S.S.G. §4B1.5(b) is discounted. The Guidelines Sentencing Manual

Judicial unease over the upward ratcheting of the guidelines extends even to production cases. A recent Sentencing Commission study of sentencing practices in such cases noted that the rate of downward variance from advisory guideline sentencing ranges in production cases is substantially higher than in other categories of cases.[7]

An individualized, evidence-based sentence is required both by § 3553(a) and by the fundamental role of independent courts: "The legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship. That reputation may not be borrowed by the political Branches to cloak their work in the neutral colors of judicial action." *Mistretta v. United States*, 488 U.S. 361, 407 (1989). Here, both the applicable advisory guideline sentence range in this case and Probation's calculation in the Presentence Report ("PSR") is greatly inflated, unsupported by empirical evidence, and provides little assistance to the Court in determining a just sentence that is "sufficient but not more than necessary" as mandated by 18 U.S.C. § 3553(a). A mechanical application of the guidelines cannot in these circumstances produce what § 3553(a) requires.

## I.    **Even if Properly Calculated, the Guideline Sentencing Range Is of Little Help in Determining a Sufficient, But Not Greater Than Necessary Sentence in Mr. Raymond's Case.**

Mr. Raymond objects to Probation's calculation of both the total offense level in this case (47), and the applicable advisory guideline term of imprisonment (4680 months) reflected in Paragraph 167 and page 31 of the PSR. To reach its proffered guideline term of imprisonment of

---

provides that conduct involving multiple victims are not grouped. U.S.S.G. § 3D1.4. Here, this results in a five-point increase in offense level. PSR ¶ 122.

[7] *See* Note 6, supra, U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography Production Offenses*, at 3 *Key Findings 2* (a majority of production offenders - 57.2% - received a variance below the applicable guideline range).

4,680 months, Probation combines the statutory maximum of 30 years (360 months) times thirteen for each of Mr. Raymond's thirteen counts. In so doing, Probation both misinterprets and misapplies U.S.S.G. § 5G1.2 and 18 U.S.C. § 2251(e), neither of which require mandatory consecutive stacking of Mr. Raymond's thirteen counts of conviction. After accounting for timely acceptance of responsibility, Mr. Raymond's total offense level is 43, and with a Criminal History Category of 1 with no prior record of convictions, his GSR is 360 months imprisonment.

### A.  The Correct Total Offense Level is 43.

Mr. Raymond does not dispute Probation's calculation of the respective base offense levels, specific offense characteristics, and adjusted offense levels for each of his thirteen counts of conviction. He submits, however, that insofar as Probation reports his total offense level is 47, it should be treated as a level 43, which is the highest offense level on the Sentencing Table. *See* U.S.S.G. Chapter 5, Part A (comment n. 2), cited in the PSR at footnote 7 (noting that where the total offense level exceeds 43, the offense level *should be treated as a level 43*).

Treating the total offense level as 47, beyond the highest level on the Sentencing Table, in effect also denies recognition that Mr. Raymond accepted responsibility. This acceptance saved judicial resources and spared the victims the distress of having to testify in front of a jury. In recognition of this, the Court should downwardly vary, or at least treat the offense level as 43.[8]

### B.  The Correct Guideline Sentencing Range, Applying Both U.S.S.G. § 5G1.1 and 5G1.2, is 360 Months.

In calculating the guideline term of imprisonment, Probation misinterprets what constitutes

---

[8] *See also United States v. Farley,* 36 F.4th 1245 (10th Cir. 2022) (reaffirming downward variance to 360-life, as representing a one-level variance from any life guideline, regardless of how far above level 43 the total offense level would have been if not capped at 43, and reversing because the sentencing judge described the joint proposed downward variance to 40 years as 10-levels rather than one level).

the "total punishment" in this case under U.S.S.G. § 5G1.2(d), and thus incorrectly stacks thirteen 30-year maximum sentences to reach a consecutive total term of imprisonment of 4,680 months, or 390 years. Although the concept of "total punishment," as defined in U.S.S.G. § 5G1.2, provides guidance as to how a sentence of imprisonment on multiple counts should be structured, it does not address how the guideline sentencing range should be calculated in the first instance. Specifically, § 5G1.2 does *not* establish a guideline range of 4,680 months, nor does it override the Sentencing Table calculation or direct that statutory maximum sentences be added together to create a sentencing range divorced and independent from Chapters 2, 3, and 4 of the Sentencing Guidelines.

The Sentencing Commission requires that the Guidelines sentencing range account for the relevant factors in a particular order. Application Note 1 to U.S.S.G. § 5G1.2 prescribes not just the factors (adjusted combined offense level, Criminal History Category, guideline range on the Sentencing Table, total punishment) but the order in which those factors are to be applied, and expressly directs that total punishment is determined *after* fixing the guideline range on the Sentencing Table.

Specifically, "total punishment" is the "combined length of sentences" to be determined "*after* determining the adjusted combined offense level and the Criminal History Category and determining the defendant's guideline range on the Sentencing Table in Chapter Five, Part A." Application Note 1 to U.S.S.G. § 5G1.2 (emphasis added); *See also* Application Note 3 (affirming that U.S.S.G. § 5G1.2 addresses the procedure for *imposing a sentence* not *calculating a guideline range* independent from the Sentencing Table). In sum "total punishment" is the sentence that this Court chooses to impose, not a Guidelines calculation or a Guidelines sentencing range. *See*, *e.g.*,

*United States v. Iniguez*, 368 F.3d 1113, 1114 (9th Cir. 2004) (en banc) ("total punishment" under § 5G1.2(d) is the sentence the district court chooses from the appropriate sentencing range, whether that be the minimum sentence in the range, the maximum sentence in the range, or something in between) (quotations and citations omitted).

This understanding of U.S.S.G. § 5G1.2 finds further support in Chapter Three, which clarifies that total punishment is determined by reference to the combined offense level, a number that relates to the single most serious count as potentially enhanced by multiple counts. *See* U.S.S.G. § 3D1.5 ("Use the combined offense level to determine the appropriate sentence in accordance with the provisions of Chapter Five.").

The Guidelines are driven by the most serious offense of conviction. Here, Mr. Raymond's convictions under 18 U.S.C. §§ 2251(a) and (e) carry statutory maximum sentences of 30 years. Though the adjusted combined offense level is 43, and a level of 43 is assigned life imprisonment on the Sentencing Table, "life" is not the guideline sentence. Section 5G1.1(a) provides that "[w]here the statutorily authorized maximum sentence is less than the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." Note 1 to the Commentary to § 5G1.2 provides further guidance for both single count and multiple count convictions, and notes that defendant's guideline range can be affected or restricted by a statutorily authorized maximum sentence. Here, because the statutory maximum on all counts here is 360 months/30 years, the guideline sentence is 360 months. See § 5G1.1(a).

Moreover, regardless of whether the guideline sentence is 360 months or life, there is nothing in U.S.S.G. § 5G1.2 or the Application Notes that requires the consecutive stacking of all maximum sentences. Under § 5G1.2(d), the "total punishment" must have a meaning independent

of whatever sentence results from running all counts consecutively (as the PSR does here). Otherwise, the proviso in the guideline "only to the extent necessary to produce a combined sentence equal to the total punishment" would have no meaning. Additionally, U.S.S.G. § 5G1.2(d) clearly prescribes a presumption of concurrent sentences by limiting consecutive sentencing to only what is necessary to reach the total punishment. *See* U.S.S.G. § 5G1.2(d) ("In all other respects, sentences on all counts shall run concurrently, except to the extent otherwise required by law."). Simply running all sentences consecutively here clearly runs afoul of this presumption.

A special absurdity results in running all sentences consecutively to reach a fixed number in life sentence cases where that number would so clearly exceed any one person's natural lifetime. Pursuant to Appendix A to the U.S. Sentencing Commission 2020 Sourcebook of Federal Sentencing Statistics, p. 203, regarding "Length of Imprisonment," the Sentencing Commission equates a life sentence with 470 months: "In cases where the court imposes a sentence of life imprisonment, a numeric value is necessary to include these cases in any analysis. Accordingly, life sentences are reported as 470 months, a length consistent with the average life expectancy of federal criminal offenders given the average age of federal offenders." Notably, for those offenders in Criminal History Category I whose primary guideline was § 2A1.1, First Degree Murder, and whose offense level was 43 (calling for a "life" sentence on the Sentencing Table), the median length of imprisonment was 470 months, further demonstrating the actual/practical application of "life" sentences.[9]

---

[9] *See* U.S. Sentencing Com'n, Judiciary Sentencing Information data for Primary Guideline § 2A1.1 at cell I, 43, https://jsin.ussc.gov/analytics/saw.dll?Dashboard, reflecting that for the First Degree Murder Guideline, over the last five fiscal years (FY2017-2021), there were 57 offenders whose primary GL was 2A1.1, total offense level 43, and CHC 1, The average length of

This stipulation of 470 months for life sentences, however, was based upon the average life expectancy of federal criminal offenders given the average age of federal offenders. Here, because of Mr. Raymond's advanced age (65 years), a life sentence would be closer to roughly 18 years, or 216 months, as according to the Social Security Administration, a 65-year-old male has a life expectancy of 18.09 years.[10] Thus, under the Commission's measure, and in light of the instruction of parsimony under § 5G1.2(d), consecutive sentences should be imposed in this case "only to the extent necessary" to reach 216 months, given Mr. Raymond's actual life expectancy.[11]

### C.  Objection to Upward Departures Under U.S.S.G. §§ 2G2.1 and 3D1.4

Mr. Raymond objects to both potential grounds for upward departures noted in Paragraph 182 of the PSR, under either or both U.S.S.G. § 2G2.1, and U.S.S.G. § 3D1.4. These issues are adequately addressed by Probation's application of U.S.S.G. § 2G2.1(d), expressed in ¶ 26 of the PSR, which treats each minor victim as a separate count of conviction for grouping. With respect to the potential ground for upward departure under U.S.S.G. § 3D1.4, the Guidelines are silent as to what constitutes "significantly more than 5 Units" and there is no support for a finding that the separately grouped units here would warrant such a departure, especially where most of the crimes of conviction involved non-completed offenses and where there are varying offenses and harms.

---

imprisonment for those offenders was 420 months, and the median length of imprisonment was 470 months.

[10] *See* Social Security Administration, Actuarial Life Table, "Period Life Table, 2019, as used in the 2022 Trustees Report," http://www.ssa.gov/oact/STATS/table4c6.html.

[9] In response to a defendant's contention that a life sentence under the Guidelines is 470 months, the Eleventh Circuit in *United States v. Kirby*, 938 F.3d 1254 (11th Cir. 2019) found no procedural error in imposing a 1440-month sentence where neither the Guidelines nor any circuit has defined "life imprisonment." The First Circuit in *United States v. Breton,* 740 F.3d 1, 22 (1st Cir. 2014) said that the Guidelines do not have a "cap" limiting life sentences to 470 months. Neither case dictates, however, that a sentence equal to a defendant's life expectancy cannot be a life sentence.

*See* Background in Application Notes to U.S.S.G. § 3D1.4. The Sentencing Commission suggests that such an upward departure is not only rare, but that the risk of an inadequate sentence imposition is sufficiently safeguarded by the court's "latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense." *Id.* Where Mr. Raymond's applicable guideline term of imprisonment is 360 months, an upward departure is not only unnecessary, but the seriousness and adequacy of the guideline sentencing range is already established. If the guideline term of imprisonment is otherwise calculated at life imprisonment, the same is true where there is no "upper end of" life imprisonment.

## **ARGUMENT**

Mr. Raymond's conduct was reprehensible, and the defense does not suggest otherwise. But the sentence that the government asks this court to impose is on par with those imposed in cases of convicted recidivists facing enhanced penalties of minimum mandatory sentences of 25 years, and maximum sentences of 50 years.[12] Sentencing Mr. Raymond the same as a convicted recidivist would not fulfill the sentencing goals laid out in 18 U.S.C. § 3553(a) and would only serve to incapacitate him for the remainder of his natural life. A federal sentence cannot comport with the law if it driven solely by the moral outrage that guides the government recommendation; the law requires each court to take into consideration other factors, including criminal history and the treatment of other offenders around the country. Regardless of how the Court applies the

---

[12] *See* 18 U.S.C. § 2251(e), increasing the minimum mandatory sentence to 25 years, and the maximum to 50 years, for those defendants convicted under this statute who have one prior conviction "under the laws of any State relating to aggravated sexual abuse, sexual abuse, [or] abusive sexual contact involving a minor or ward" or one prior conviction under "[section 2251], section 1591, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to . . . sex trafficking of children, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography."

Guidelines, a sentence of fifteen years is "sufficient, but not greater than necessary" to accomplish the goals of sentencing under 18 U.S.C. § 3553(a).

Under 18 U.S.C. § 3553(a)(2)(A), the Court must consider the need for the sentence to "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As discussed throughout and below, the length of the proposed sentence reflects the severity of the crime but also takes into account Mr. Raymond's personal history and characteristics, his need for programming and sex offender treatment, and his substantially reduced risk of future recidivism. As to the need under 18 U.S.C. § 3553(a)(2)(B) for the sentence imposed to "afford deterrence to criminal conduct," the proposed sentence will promote both specific and general deterrence. The length of the proposed sentence far exceeds any prior period of detention that Mr. Raymond has served and will be more than sufficient to deter him from reoffending. Indeed, as will be discussed in more detail below, it will incapacitate him until he is elderly, further reducing the likelihood of recidivism. Moreover, the obvious severity of a 15-year sentence will promote general deterrence to any individual who might be inclined to engage in this sort of conduct.

*Substantially Reduced Risk of Recidivism*

Under 18 U.S.C. § 3553(a)(2)(C), the Court must also consider the need "to protect the public from further crimes of the defendant." Given that Mr. Raymond is now 65 years old and the proposed sentence would incarcerate him until he is nearly in his eighties, there is ample to reason to conclude that he will pose a far lower risk of recidivism generally, and sexual recidivism

15

specifically.[13] In general, the Sentencing Commission has found that recidivism rates consistently drop as offenders age.[14]

Age is, unquestionably, the single most robust predictor of sexual recidivism. As one ages, the risk of sexual recidivism declines. This inverse relationship between age and sexual recidivism has been well-documented in the peer-reviewed research literature in sex offender recidivism for over 20 years. In 1998, researchers Hanson and Bussière published their seminal meta-analysis examining predictors of sexual recidivism using data from twenty-one follow-up studies with a collective sample of 6,969 individuals. Their research revealed the consistently negative relationship between age and sexual recidivism: the older the individual, the smaller their risk for sexual reoffending.[15] Several years later, Dr. Hanson conducted another large-scale examination of 4,673 individuals with sexual offenses from ten samples. This study also identified the decrease in sexual recidivism with age at release.[16] Although Dr. Hanson discovered some differences in

---

[13] Prisoners are eligible to receive up to 54 days of good time for each year of the sentence under 18 U.S.C. § 3624(b).  Due to the nature of his convictions, Mr. Raymond is *not* eligible for additional earned time credits under the recently enacted First Step Act. *See* 18 U.S.C. § 3632(d)(4)(D) (listing the instant offenses as disqualifying offenses for the earning of additional time credits).

[14] U.S. Sentencing Com'n, *The Effects of Aging on Recidivism Among Federal Offenders* at 3 (Key Findings) (December 2017), https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (noting both that the lack of a prior criminal history and completion of higher education were factors contributing to lower recidivism rates, and that older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of sentence imposed).

[15] Hanson, R. K., & Bussière, M. T. (1998). Predicting relapse: A meta-analysis of sexual offender recidivism studies. Journal of Consulting and Clinical Psychology, 66(2), 348–362. https://doi.org/10.1037/0022-006X.66.2.348.

[16] Hanson, R. K. (2002). Recidivism and age: Follow-up data from 4,673 sexual offenders. Journal of Interpersonal Violence, 17(10), 1046–1062. https://doi.org/10.1177/08862605-0201710-02.

the relationship between age and recidivism across offense type[17], sexual recidivism risk ultimately consistently decreased with age at release.

These findings are consistent with a significant body of research that has established that as age increases, the likelihood of reoffending decreases.[18] This is especially true for those who were over age 60 at release, with very low (or no) sexual recidivism occurring, regardless of the nature of previous sexual offending.[19] And specifically for Mr. Raymond, if he were to be released at or near 80 years old, his statistical risk of sexual re-offense, based on age alone would similarly

---

[17] In this study - the effect of age on recidivism was not uniformly linear, with the pattern of recidivism over time varying by type of offense. For example, individuals who committed extra-familial child molestation tended to remain at higher levels of risk in their 20s and 30s, plateauing in their 40s with a drop-off occurring after age 50; by contrast, risk among those who committed rape or incest reduced in a more linear fashion.

[18] Helmus, L., Thornton, D., Hanson, R. K., & Babchishin, K. M. (2012). Improving the predictive accuracy of Static-99 and Static-2002 with older sex offenders: Revised age weights. Sexual Abuse, 24(1), 64–101. https://doi.org/10.1177/1079063211409951; Hanson R. K. (2006). Does static-99 predict recidivism among older sexual offenders? *Sexual Abuse: Journal of Research and Treatment*, 18(4), 343–355. 10.1177/107906320601800403; Nicholaichuk, T. P., Olver, M. E., Gu, D., & Wong, S. C. (2013). Age, actuarial risk, and long-term recidivism in a national sample of sex offenders. Sexual Abuse, 26(5), 406–428. https://doi.org/10.1177/1079063213492340;

[19] Barbaree, H. E., Blanchard, R., & Langton, C. M. (2003). The development of sexual aggression through the life span: The effect of age on sexual arousal and recidivism among sex offenders; In R. Prently, E. Janus, & M. Seto (Eds.), Understanding and managing sexually coercive behavior (Annals of the New York Academy of Sciences, Vol. 989, pp. 59-71). New York, NY, USA: New York, Academy of Sciences; Hanson, R. K. (2006). Does Static 99 predict recidivism among older sexual offenders? Sexual Abuse, 18(4), 343–355. https://doi.org/10.1177/107906320601800403; Ambroziak, Et. Al (2020). Are Civilly Detained and Committed Sexually Violent Persons Released after Age 60 Low Risk? Criminal Justice and Behavior, 48(7), 981-998. https://doi.org/10.1177/0093854820972448; Azizian, Et Al. (2021). A Preliminary Analysis of Sexual Recidivism and Predictive Validity of the Static-99R in Men Discharged From State Hospitals Pursuant to California's Sexually Violent Predator Act. Sexual Abuse, 34(1). https://doi.org/10.1177/10790632211019726; Harris, A. J. R., & Hanson, R. K. (2004). Sexual offender recidivism: A simple question. (Corrections User Report No 2004 – 01). Ottawa, Ontario, Canada: Public Safety and Emergency Preparedness Canada. Retrieved from http://www.publicsafety.gc.ca/res/cor/rep/2004-03-se-offeng.aspx.

be, statistically, non-existent.[20] Other factors, like treatment and social and community supports, can also reduce his risk of recidivism even further. The combination of Mr. Raymond's age, circumstances, and future treatment make the actual risk, once released after having served 15 years, near zero. When he is released, he will be subject to sex offender-specific conditions of supervised release – sixteen (16) special conditions in all. Most salient to the concerns regarding sexual recidivism, supervised release conditions will include sex offender treatment and third-party risk notification, and the Probation Office will scrupulously monitor his computer use and he will be prohibited from having any unsupervised contact with children.

Finally, at whatever time Mr. Raymond completes his imprisonment, he will face the prospect of civil confinement under 18 U.S.C. § 4248 as a sexually dangerous person. Should the government contend that Mr. Raymond poses a risk to the public in his waning years, that matter can be fairly heard prior to his release—and with the benefit of considerably more extensive treatment and information about his risk than is available to the court today.

*Need for Sex Offender Treatment*

Under 18 U.S.C. § 3553(a)(2)(D), the Court must also consider the need "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." To undersigned counsel's knowledge, sex offender treatment is not provided to pretrial detainees at the Norfolk County Correctional Facility where

---

[20] *See* note 16, supra, Hanson, R. K. (2002) (an extra-familial child molester (which Mr. Raymond would be classified as, given that is his dominate victim category) at age 70 years old and on, corresponds to a recidivism rate of zero); note 19, supra, Barbaree, H. E., et al., at p. 64 (showing that for child molesters in the study, by age 70, the statistical risk of recidivism is zero); Hanson, R. K., Harris, A. J. R., Helmus, L., & Thornton, D. (2014). High-risk sex offenders may not be high risk forever. *Journal of Interpersonal Violence*, *29*, 2792-2813. doi:10.1177/0886260514526062.

Mr. Raymond is detained; had it been available, he would have engaged and started treatment long ago. Mr. Raymond recognizes the need to engage in sex offender treatment and intends to avail himself of all available treatment while serving his sentence.

A sentence of longer than 15 years will unnecessarily delay Mr. Raymond's access to treatment and would thus be antithetical to rehabilitation. He will undoubtedly receive sex offender treatment while imprisoned in the Bureau of Prisons ("BOP"), and indeed asks for a judicial recommendation to a facility where he can engage in such treatment. But because inmates ordinarily participate in the two relevant sex offender treatment programs during the last 36-48 months of their sentence,[21] a sentence of longer than 15 years would only further remove Mr. Raymond from the treatment he so obviously needs. There is no reason to further postpone treatment any longer than it will already be delayed. This would be antithetical to rehabilitation in violation of 18 U.S.C. § 3553(a)(2)(D) and, almost standing alone, would make a sentence of greater than 15 years "greater than necessary" to accomplish the purposes of sentencing.

As noted above, participation in sex offender treatment additionally contributes to his already low risk of recidivism. For sex offenders, cognitive behavioral therapy substantially reduces recidivism.[22] When released from prison, Mr. Raymond will be able to continue this treatment in the community, which will further reduce any future recidivism risk.

---

[21] BOP, "*Sex Offenders*," https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp ("Offenders typically participate in sex offender treatment in the final three years of their incarceration"), and BOP Program Statement 5324.10, "Sex Offender Programs," https://www.bop.gov/policy/progstat/5324_010.pdf

[22] U.S. Dep't of Justice, Center for Sex Offender Management, *Understanding Treatment for Adults and Juveniles Who Have Committed Sex Offenses* 10 (2006); *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal Child Pornography Offenses* (2012) ["*Child Porn Report*"] at 278 and n. 31 (quoting Center of Sex Offender Management, The Comprehensive Approach to Sex Offender Management 5 (2008), finding that "appropriate 'treatment interventions'…are

*Sentencing Disparities*

The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct is codified in 18 U.S.C. § 3553(a)(6). The Sentencing Commission provides data of dispositions for defendants whose primary guideline was U.S.S.G. § 2G2.1,[23] but this data is limited and does not reveal or consider the defendants' education, ages, nature of offenses, background or other mitigating factors. As a result, it may be difficult for the Court to draw meaningful comparisons between those cases and this one.

Though the government will surely cite to numerous heinous offenses that received lengthy sentences of imprisonment to justify its sentencing recommendation here,[24] there are a comparable, if not equal, number of cases in which abhorrent conduct was punished by the minimum mandatory sentence of 15 years.[25] While there is certainly a spectrum of behavior and

---

associated with very significant lower rates of recidivism).

[23] *See* U.S. Sentencing Com'n, Judiciary Sentencing Information data for Primary Guideline § 2G2.1 at cell VI, 13, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

[24] In disposition discussions with counsel, the government referred to the case of *United States v. Sheehan*, 1: 18-cr-10391-RGS, as a touchstone or reference point for its sentencing recommendation here. As this Court knows, the *Sheehan* case involved the repeated sexual assaults of three young male victims, most of which were recorded by the defendant on video, and the report of which prompted a fourth minor victim to report his own abuse at the hands of the defendant. *See* D.E. # 132, Gov't Sentencing Memo, at 2. The defendant failed to demonstrate timely acceptance, and entered into a conditional plea agreement on the eve of trial, after having forced the government to prepare victims and witnesses to testify. The Court imposed a total 540-month sentence on the 51-year-old defendant, who – with statutory good time – will likely serve a total of 440 months and be released when he is in his 80s.

[25] *See e.g., United States v. Sawyer*, 1: 16-cr-30031-MGM, at D.E. # 2, and 104 (180-month concurrent sentences imposed on attempted sexual exploitation offenses, where plea agreement reflected a total offense level of 42 and where defendant coerced nude photos from one minor victim with threats of rape and murder, attempted to do the same with another minor); *United States v. Wong*, 3: 14-cr-30029-MGM (defendant convicted of ten counts of sexual exploitation of children, court imposed 180-month concurrent sentences notwithstanding total offense level of 43

harms that merits a spectrum of punishment, offenses involving the production of child pornography are perhaps the offenses worst suited for comparison – the harms are painfully difficult to quantify and to compare. An individualized, evidence-based sentence requires acknowledgment of this spectrum, and Mr. Raymond's place in it, but comparisons of abhorrent conduct – without more – only assists the Court so much. Indeed, federal judges regularly sentence individuals for far more egregious and harmful misconduct, including selling and mass distributing large quantities of images around the world for money, violently raping multiple victims, and producing bondage and masochism videos of tortured children – none of which are at issue here.

*Aging Offenders*

Whatever sentence the Court imposes, Mr. Raymond, will grow old in the BOP, which has long been ill-equipped to care for elderly inmates and the associated medical conditions they present. A 2008 audit by the Office of the Inspector General found systemic deficiencies in the BOP's delivery of health services.[26] In 2016, the OIG issued a related report that reviewed the BOP's medical staffing challenges.[27] The review found that chronic staffing shortages "limit inmate access to medical care, result in an increased need to send inmates outside the institution for medical care, and contribute to increases in medical costs."[28] Congress has mandated that the Court consider the most effective treatment of Mr. Raymond's inescapable future medical issues

and government's proffered guideline sentencing range of 3,600 months).

[26] U.S. Dept. of Justice, Office of the Inspector General Audit Division, *The Federal Bureau of Prisons Efforts to Manage Inmate Health Care*, ii-xix, 32-34 (2008) https://oig.justice.gov/reports/BOP/a0808/final.pdf.

[27] U.S. Dept. of Justice, Office of the Inspector General Evaluation and Inspections Divisions, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges* (2016) https://oig.justice.gov/reports/2016/e1602.pdf.
[28] *Id* at i.

when fashioning the sentence. 18 U.S.C. § 3553(a)(2)(D). In light of the Inspector General's audit and BOP's continuing failure through the coronavirus pandemic to address life-threatening health issues, there is little reason to believe that BOP will provide even adequate treatment, let alone the most effective treatment, for the inevitable health issues Mr. Raymond faces in the coming years.

*Conditions of Pretrial Detention*

Though perhaps well understood by the Court at this stage in the pandemic, the ongoing and devastating COVID-19 crisis has made Mr. Raymond's pretrial detention much more onerous and stressful. At the Norfolk County Correctional Facility where he has been imprisoned since his arrest in this case, he has been subjected to frequent lockdowns and quarantine periods, which has limited his movement and access within the facility. Pretrial programming has been severely limited, if available at all. And although he is able to speak with family and friends by telephone, in-person visits have been significantly curtailed due to COVID exposure concerns. Prior to his arrests in this case, and the related state cases, Mr. Raymond had never before been incarcerated. The entire course of his pretrial detention to date has been shaped by the pandemic and its associated lockdowns. He even contracted COVID while detained, *see* PSR ¶ 148, and though he is fully vaccinated, he remains at risk for severe infection and complications should he be reinfected given his age and underlying conditions. *Id.*

Here, the Court has the benefit of understanding Mr. Raymond's difficult experiences in pretrial detention and should consider that in imposing a parsimonious and proportional sentence. *United States v. Estrada*, No. 19-cr-5058-BAS, 2021 U.S. Dist. LEXIS 80602, at *2 (S.D. Cal. Apr. 27, 2021) (noting downward departure "because the conditions of confinement were particularly harsh during the pandemic."); *United States v. Romero*, 2021 U.S. Dist. LEXIS 73877,

at *9 (S.D.N.Y. Apr. 16, 2021) (observing "long before the current pandemic, courts had recognized that periods of presentence custody spent in unusually hard conditions merited recognition by courts in measuring the just sentence."). Even before the pandemic, courts imposed downward departures based on harsh pretrial conditions. *See, e.g.*, *United States v. Hernandez-Santiago*, 92 F.3d 97, 101, n.2 (2d Cir. 1996) (pre-COVID case noting district court's three-level downward departure "because the defendant had been incarcerated for 22 months . . . in a state facility, in the district court's view a 'harsher incarceration' than federal imprisonment because of its lack of educational and therapeutic programs.")

*A Lifetime of Punishment*

As several courts have recognized, collateral consequences of conviction, such as registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (district court's consideration of the lasting effects of being required to register as a sex offender is appropriate mitigating factor in sentencing); *United States v. Autery*, 555 F.3d 864, 875 (9th Cir. 2009) (characterizing sex offender registration as "a punishment of lifelong significance (which can cause the listed person to become so socially ostracized that he has difficulty living in many communities)"). These collateral consequences of conviction – though civil, and not intentionally punitive in nature – should nonetheless be considered in the calculus of a sentence's reasonableness and parsimony. This is especially true where the "collateral consequences of child pornography convictions are extreme, perhaps more extreme in some ways than any other form of criminal activity… It is a crime of extreme shame and humiliation." *United States v. Bhavsar*, 10-CR-40018-FDS, ECF No. 56, Excerpt Transcript of Sentencing at 8.

For Mr. Raymond, these convictions will follow him the rest of his life, no matter whether he reoffends and no matter whether he successfully completes treatment. He likely will be subject to harassment, and maybe violence, both in prison and afterwards in the community. He will be ashamed, and shamed, for the rest of his life. He profoundly understands and is remorseful for the harm that his offenses have caused to his victims, to his family and friends, and to his community. But in considering the need for parsimony and for the sentence to reflect an individualized determination of his actions, personal history, and low risk of recidivism, it is important to recognize that Mr. Raymond's convictions alone in this case carry a lifetime of punishment and will require a lifetime of reparation in society's eyes.

## Conclusion

Philip Raymond committed serious crimes that merit significant punishment. The requested sentence of 15 years' imprisonment is a profoundly severe, life-altering sentence that will deprive Mr. Raymond of most of his remaining life. The period of incarceration will provide retribution and general and specific deterrence. Not only will it provide Mr. Raymond ample time for rehabilitation, each day past 15 years unnecessarily postpones the treatment he needs and undermines the very rehabilitation the law requires. Accordingly, that sentence is sufficient but not greater than necessary and should be imposed.

PHILIP RAYMOND
By His Attorney:

/s/ Sandra Gant
Sandra Gant, BBO # 680122
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061 (phone)

24

617-223-8080 (fax)
sandra_gant@fd.org

### Certificate of Service

I, Sandra Gant, hereby certify that this document was this day filed through the ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing ("NEF") via electronic mail.

Date: October 7, 2022                              */s/ Sandra Gant*
                                                   Sandra Gant